STEVEN M. NATHAN (Bar No. 153250)
snathan@hausfeld.com
**HAUSFELD LLP**
33 Whitehall Street, 14th Floor
New York, NY 10004
Telephone: (646) 357-1100
Facsimile: (212) 202-4322

*Attorney for Plaintiff and The Proposed Class*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALANNA ROBERSON, on behalf of herself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> HOT TOPIC, INC. d/b/a HOT TOPIC and BOXLUNCH, and SNOWFLAKE, INC., <br><br> Defendants. | Case No.: _____ <br><br> **CLASS ACTION COMPLAINT** <br><br> **DEMAND FOR A JURY TRIAL** |

Plaintiff Alanna Roberson ("Plaintiff") brings this Class Action Complaint ("Complaint") against Defendants Hot Topic, Inc. d/b/a Hot Topic and BoxLunch ("Hot Topic"), and Snowflake, Inc. ("Snowflake") (collectively "Defendants") as an individual and on behalf of all others similarly situated, and alleges, upon personal knowledge as to her own actions and her counsels' investigation, and upon information and belief as to all other matters, as follows:

## **SUMMARY OF ACTION**

1. Plaintiff brings this class action against Defendants for failing to properly secure and protect the sensitive information of their customers and loyalty account members.

2. Hot Topic operates a chain of retail stores under various brand names, including Hot Topic and BoxLunch.

3. Snowflake is a cloud-based data hosting company used by some of the biggest and most recognized companies in America and overseas, including Hot Topic. Headquartered in Bozeman, Montana, Snowflake has approximately 20% of the web hosting market share globally.

4. Hot Topic collected and maintained certain personally identifiable information (personally identifiable information" or "PII") of the putative Class Members (defined below), who are (or were) Defendant Hot Topic's customers and/or loyalty account members.

5. Hot Topic uses Snowflake's data cloud services to store the PII entrusted to it by Hot Topic's customers and/or loyalty account members.

6. Defendants owed a non-delegable duty to Plaintiff and Class Members to implement reasonable and adequate security measures to protect their PII and to oversee third parties entrusted with that data to ensure those third parties had proper data security measures in place.

7. The sensitive and personal information of Plaintiff and Class Members—which they entrusted to Hot Topic with the mutual understanding that Hot Topic would protect it against disclosure—was targeted, compromised and unlawfully accessed due to the data breach in or around October 2024 (the "Data Breach"). Upon information and belief, cyber-criminals hacked into the systems of Snowflake, used by Hot Topic for storing and analyzing large amounts of customer data, ultimately obtaining PII for what the cybercriminals claim is approximately

CLASS ACTION COMPLAINT

350 million customers,[1] including Plaintiff's and Class Members' full names, email addresses, physical addresses, phone numbers, dates of birth and credit card information.

8.    The Data Breach occurred because Defendants failed to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect consumers' PII from a foreseeable and preventable cyber-attack.

9.    Upon information and belief, the PII compromised in the Data Breach included Plaintiff's and Class Members' full names, email addresses, physical addresses, phone numbers, dates of birth and payment card information.

10.    The PII compromised in the Data Breach was exfiltrated by cyber-criminals and remains in their possession, where it is valuable to identity thieves.

11.    As a result of the Data Breach, Plaintiff and Class Members suffered concrete injuries in fact including, but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of their PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) actual misuse of the compromised data consisting of an increase in spam calls, texts, and/or emails; (viii) nominal damages; and (ix) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect their PII.

---

[1] https://www.infostealers.com/article/largest-retail-breach-in-history-350-million-hot-topic-customers-personal-and-payment-data-exposed-as-a-result-of-infostealer-infection/ (last visited Dec. 10, 2024).

CLASS ACTION COMPLAINT

12.     Moreover, upon information and belief, Defendants were targeted for a cyber-attack because they are large companies that collect and maintain highly valuable PII on their systems.

13.     Defendants maintained, used or shared Plaintiff's and Class Members' PII in a negligent and/or reckless manner. In particular, the PII was used and transmitted by Defendants in a condition such that it was highly vulnerable to cyberattacks. Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiff's and Class Members' PII was a known risk to Defendants, and thus, Defendants were on notice that failing to take steps necessary to secure the PII from those risks left that property in a dangerous condition.

14.     Defendants disregarded the rights of Plaintiff and Class Members by, among other things, intentionally, willfully, recklessly, or negligently failing to implement adequate and reasonable measures to protect their data systems against unauthorized intrusions; failing to take standard and reasonably available steps to prevent the Data Breach; and failing to provide Plaintiff and Class Members prompt and accurate notice of the Data Breach.

15.     Plaintiff's and Class Members' identities are now at significant risk as a result of Defendants' negligent conduct because the PII that Defendants collected and maintained has been accessed and acquired by data thieves.

16.     With access to the PII obtained in the Data Breach, data thieves have already engaged in identity theft and fraud. Additionally, the data thieves can and will commit crimes in the future including, for example, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, obtaining driver's licenses in Class

CLASS ACTION COMPLAINT

Members' names but with another person's photograph, and giving false information to police during an arrest.

17.     As a direct and proximate result of the Data Breach, Plaintiff and Class Members have a heightened and imminent risk of fraud and identity theft. Plaintiff and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft.

18.     Plaintiff and Class Members are also likely to incur out of pocket costs as a result of the Data Breach such as purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

19.     Plaintiff brings this class action lawsuit on behalf of all those similarly situated to address Defendants' inadequate safeguarding of Class Members' PII that they collected and maintained, and for failing to provide timely and adequate notice to Plaintiff and other Class Members that their information had been subject to the unauthorized access by an unknown third party and precisely what specific type of information was accessed.

20.     Through this Complaint, Plaintiff seeks to remedy these harms on behalf of herself and all similarly situated individuals whose PII was accessed and stolen during the Data Breach.

21.     Plaintiff and Class Members have a continuing interest in ensuring that their PII is properly safeguarded, and they should be entitled to injunctive and other equitable relief.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). There are at least 100 putative Class Members, the aggregated claims of the individual Class Members exceed the sum or value of $5,000,000 exclusive of interest and costs, and members of the proposed Class, including Plaintiff, are citizens of states different from Defendants.

CLASS ACTION COMPLAINT

23.    This Court has jurisdiction over Defendant Hot Topic through its business operations in this District, the specific nature of which occurs in this District. Defendant Hot Topic's principal places of business is in this District. Defendant intentionally avails itself of the markets within this District to render the exercise of jurisdiction by this Court just and proper.

24.    This Court has jurisdiction over Defendant Snowflake because Snowflake is authorized to conduct business in this District and has entered into contracts to conduct substantial business in this District, including with Defendant Hot Topic. Snowflake has engaged in continuous, systematic, and substantial activities within this State, including substantial marketing and sales of services and products in connection with the Data Breach within this State. Further, a substantial part of the acts and omissions giving rise to Plaintiff's claims against all Defendants occurred in and emanated from this District.

25.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because Defendant Hot Topic's principal place of business is located in this District and a substantial part of the events and omissions giving rise to this action occurred in this District.

## **PARTIES**

### *Plaintiff*

26.    Plaintiff Alanna Roberson is a resident and citizen of Marysville, Washington, which is in the county of Snohomish, Washington.

27.    Plaintiff was a customer at Defendant Hot Topic's retail stores. Plaintiff's information was collected by Hot Topic and stored in Hot Topic's and Snowflake's systems.

*Defendants*

28.    Defendant Hot Topic is a California corporation with its principal place of business located in City of Industry, California, which is in Los Angeles County, California.

29.    Defendant Snowflake is a Delaware corporation with its headquarters and principal place of business located in Bozeman, Montana.

## FACTUAL ALLEGATIONS

*Defendants' Businesses*

30.    Defendant Hot Topic operates a chain of retail stores under multiple brand names, including Hot Topic and BoxLunch.

31.    Snowflake is a cloud-based data storage and analytics company that provides a single platform for data storage, processing, and analysis. Snowflake advertises security across its products and services and markets itself as "the AI data cloud for cybersecurity."[2]

32.    Plaintiff and Class Members are current and former customers and/or loyalty account members at Hot Topic.

33.    As part of the regular course of business in a retail setting, customers and loyalty account members, including Plaintiff and Class Members, provided Hot Topic with their names, email addresses, phone numbers, dates of birth, payment card information, and other sensitive information.

34.    Upon information and belief, as part of their regular course of business and contractual relationship, Hot Topic provided Snowflake with Plaintiff's and Class Members' PII for storage, processing, and analysis.

---

[2] *Cybersecurity*, Snowflake, https://www.snowflake.com/en/solutions/departments/cybersecurity/ (last visited Dec. 9, 2024).

35.    Snowflake is one of the largest data storage providers in the United States and contracts with thousands of companies worldwide to securely store consumer and employee data on its Snowflake Data Cloud. As a result, Snowflake is responsible for developing and maintaining cybersecurity environments which collect and process personal data for these businesses and hundreds of millions of Americans. Snowflake touts its ability to do so with its Chief Information Security Officer and VP of Information Security, Brad Jones, claiming on Snowflake's website: "Since our founding in 2012, the security of our customers' data has been our highest priority. This unwavering commitment is why we're continuously strengthening our industry-leading, built-in security policies to deliver a trusted experience for our customers."[3]

36.    Upon information and belief, while collecting PII from customers and loyalty account members, including Plaintiff, Defendants promised to provide confidentiality and adequate security for the data that Defendants collected from them through their applicable privacy policies and through other disclosures in compliance with statutory privacy requirements.

37.    Hot Topic provides on its website that:

Any Personal Information we collect will be stored on servers in the United States and subject to the laws of the United States, where the data protection and other laws may differ from those of other countries.[4]

38.    Similarly, Snowflake's privacy policy advises that they have a contractual agreement with "our customers" and that, pursuant to that agreement, the "customer's privacy notice," here Hot Topic's, "will apply to the customer's

---

[3] *Snowflake Security Hub*, Snowflake,
https://www.snowflake.com/en/resources/learn/snowflake-security-hub/ (last visited Dec. 9, 2024).
[4] *Privacy Policy,* Hot Topic, https://www.hottopic.com/customer-service/hot-topic-policies/privacy-policy/?viewType=desktop (last visited Dec. 9, 2024).

CLASS ACTION COMPLAINT

collection and use" of data.[5] Snowflake further advises that "[w]e take all reasonable and appropriate steps to protect your personal information in an effort to prevent loss, misuse, and unauthorized access…."[6]

39.    Plaintiff and Class Members, as customers and/or loyalty account members at Hot Topic, relied on these promises and on these sophisticated business entities to keep their sensitive PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information. Generally, consumers demand security to safeguard their PII and only allow companies like Defendants to share that PII with others if they give express consent for such.

40.    As a result of their soliciting, obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' PII, Defendants assumed legal and equitable duties owed to Plaintiff and Class Members and knew or should have known that they were responsible for protecting Plaintiff's and Class Members' PII from unauthorized disclosure.

41.    Yet, contrary to Defendants' representations, Defendants failed to do so and failed to implement adequate data security measures, including adequate oversight of third parties entrusted with highly sensitive consumer PII, as evidenced by Defendants' admission of the Data Breach, which affects, to date, hundreds of millions of individuals.

***The Data Breach***

42.    Upon information and belief, Hot Topic uses Snowflake's data cloud services to store the PII entrusted to it by its customers and loyalty account members.

---

[5] *Privacy Policy,* Snowflake, https://www.snowflake.com/privacy-policy/ (last visited Dec. 9, 2024).

[6] *Id.*

43.    In or about October 2024, "a hacker began selling access to a database full of customer information looted from Hot Topic and two affiliated brands, BoxLunch and Torrid."[7]

44.    "On October 21, 2024, a prominent cybercriminal using the alias 'Satanic' posted a thread in which they sought to sell various databases relating to three major retail companies: Hot Topic, Torrid, and Box Lunch (all of which are founded, controlled, or owned by Defendant [Hot Topic])."[8]

45.    "The hacker, who goes by the name 'Satanic,' claims the database contains details on 350 million users, including names, email addresses, physical addresses, and dates of birth— all information that Hot Topic was asking users to fill out for its loyalty program," as well as billions of payment details.[9]

46.    Subsequently, the hacker offered the database for sale and also demanded Hot Topic pay a ransom in exchange for the hacker not selling the database.[10]

47.    Hudson Rock, an Israeli cybersecurity firm announced that it believed that "the breach is credible after discovering evidence that an employee's computer at third-party retail analytics firm Robling was infected with malware."[11] Hudson Rock's investigation found that an "employee was trying to analyze Hot Topic's data through cloud platforms such as Snowflake[,]"[12] which was also compromised in a separate Data Breach in or about May 2024. "However, the data was exposed after a hacker installed password-stealing malware on the employee's computer."[13]

---

[7] https://www.pcmag.com/news/hacker-may-have-breached-hot-topic-stolen-data-on-millions (last visited Dec. 10, 2024).
[8] https://www.infostealers.com/article/largest-retail-breach-in-history-350-million-hot-topic-customers-personal-and-payment-data-exposed-as-a-result-of-infostealer-infection/ (last visited Dec. 10, 2024).
[9] *Id.*
[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] *Id.*

48.     Despite these events, as of the time of this filing, Defendants have not filed the required Form 8-K filed with the SEC, notifying the SEC that the Data Breach occurred. Similarly, as of the time of this filing, Defendants have not formally notified Plaintiff or Class Members, via a Notice of Data Breach, that the Data Breach occurred or that Plaintiff and Class Members may be affected.

49.     Defendants had certain obligations created by the FTC Act, contract, common law, and industry standards to keep Plaintiff's and Class Members' PII safe and confidential and to protect it from unauthorized access and disclosure.

50.     Defendants failed to use reasonable security procedures and practices appropriate to the sensitive nature of the information they were maintaining for Plaintiff and Class Members, causing the exposure of PII, such as encrypting the information or deleting it when it is no longer needed.

51.     The attacker accessed and acquired files containing unencrypted PII of Plaintiff and Class Members. Plaintiff's and Class Members' PII was accessed and stolen in the Data Breach.

52.     Plaintiff further believes that her PII and that of Class Members was subsequently sold on the dark web following the Data Breach, as that is the *modus operandi* of cybercriminals that commit cyberattacks of this type.

### *Data Breaches Are Preventable*

53.     Defendants failed to use reasonable security procedures and practices appropriate to the nature of the sensitive information Defendants were maintaining for Plaintiff and Class Members, causing the exposure of PII, such as encrypting the information or deleting it when it is no longer needed.

54.     Defendants could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting their equipment and computer files containing PII.

CLASS ACTION COMPLAINT

55.    As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[14]

56.    Defendants could and should have implemented measures—as recommended by the United States Government—to prevent and detect cyberattacks and/or ransomware attacks, including the following:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

---

[14] How to Protect Your Networks from RANSOMWARE, at 3, *available at:* https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited Dec. 10, 2024).

CLASS ACTION COMPLAINT

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[15]

57.    To prevent and detect cyber-attacks or ransomware attacks, Defendants could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**

-    Apply latest security updates

-    Use threat and vulnerability management

-    Perform regular audit; remove privileged credentials;

---

[15] *Id.* at 3-4.

**Thoroughly investigate and remediate alerts**

- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**

- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events;

**Harden infrastructure**

- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[16]

58.    Given that Defendants were storing the PII of its current and former customers, Defendants could and should have implemented all the above measures to prevent and detect cyberattacks.

---

[16] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at:* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last visited Dec. 10, 2024).

CLASS ACTION COMPLAINT

59.    The occurrence of the Data Breach indicates that Defendants failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and data thieves acquiring and accessing the PII of, upon information and belief, hundreds of millions of individuals, including that of Plaintiff and Class Members.

### *Defendants Acquire, Collect, And Store Their Customers' PII*

60.    Defendants acquire, collect, and store a massive amount of PII on its current and former customers and loyalty account members.

61.    As a condition of obtaining products or services at Defendant Hot Topic or becoming a loyalty account member at Defendant Hot Topic, Defendant Hot Topic require that customers and loyalty account members entrust it with highly sensitive personal information.

62.    Snowflake provides digital warehouses, known as "Snowflake Data Clouds," for its thousands of clients around the world, including Hot Topic, and as a result has access to, stores, and maintains huge datasets of sensitive PII belonging to its corporate clients' customers and employees.

63.    By obtaining, collecting, and using Plaintiff's and Class Members' PII, Defendants assumed legal and equitable duties and knew or should have known that they were responsible for protecting Plaintiff's and Class Members' PII from disclosure.

64.    Plaintiff and the Class Members have taken reasonable steps to maintain the confidentiality of their PII and would not have entrusted it to Defendants absent a promise to safeguard that information.

65.    Upon information and belief, while collecting PII from customers and loyalty account members, Defendant Hot Topic promised to provide confidentiality and adequate security for their data through its applicable privacy policies and through other disclosures in compliance with statutory privacy requirements.

66.     Upon information and belief, while storing and maintaining PII from Hot Topic customers and loyalty account members, Defendant Snowflake promised to provide confidentiality and adequate security for their data through its applicable privacy policies and through other disclosures in compliance with statutory privacy requirements.

67.     Plaintiff and the Class Members relied on Defendants to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

68.     The Data Breach occurred, in part, because Hot Topic failed to adequately supervise third-party vendors with which it entrusted the highly sensitive PII of its customers and loyalty members. Public reports related that "the breach originated from a lack of MFA on a Snowflake account…."[17]

69.     This is consistent with the findings of Mandiant concerning a prior 2024 Snowflake data breach, which occurred as a result of the impacted Snowflake accounts not being configured with MFA.[18]

70.     Multi-factor authentication (or MFA) is a simple yet robust security measure that requires more than one method of authentication from independent categories of credentials to gain access (*e.g.*, a username/password *and* confirmation link sent via email).

71.     It is industry standard to have MFA administrator enforcement on an application level, instead of leaving it up to every user to decide whether they want to enroll with MFA or not. Yet, Snowflake "does not let companies enforce multi-factor authentication (MFA) for users…leav[ing] a gaping security hole threat actors

---

[17] https://www.infostealers.com/article/largest-retail-breach-in-history-350-million-hot-topic-customers-personal-and-payment-data-exposed-as-a-result-of-infostealer-infection/ (last visited Dec. 10, 2024).

[18] *UNC5537 Targets Snowflake Customer Instances for Data Theft and Extortion*, MANDIANT (June 10, 2024), https://cloud.google.com/blog/topics/threat-intelligence/unc5537-snowflake-data-theft-extortion (last visited Dec. 10, 2024).

can exploit."[19] According to Ofer Maor, cofounder and Chief Technology Officer of data security investigation firm Mitiga, "MFA is a critical component in protecting against identity theft, and specifically against attacks related to the successful theft of passwords through phishing, malware (infostealers), or leakage of reused passwords from compromised sites."[20] Jon Sternstein of Stern Security explained that while Snowflake does let administrators see if staff has MFA enabled, "[i]t is surprising that the built-in account management within Snowflake doesn't have more robust capabilities like the ability to enforce MFA…."[21]

72.     Because the responsibility to enforce MFA was shared by Snowflake and its corporate clients, including Hot Topic, Snowflake cannot absolve itself of liability by blaming Hot Topic for the Data Breach because Hot Topic did not require MFA to secure their Snowflake account. This is because Snowflake, "the largest cloud-data warehousing firm in the world by market share,"[22] should have, but failed to, require Hot Topic to use MFA. Not only did Snowflake fail to do so, but the security feature requiring MFA was tu*rned off by default* on Snowflake accounts.[23]

73.     Neither can Hot Topic absolve itself of liability by blaming Snowflake. Hot Topic knew (or their IT professionals were on notice) that they were unable to enforce MFA on the Hot Topic Snowflake Data Cloud. Despite this clearly present flaw and associated risk, Hot Topic elected to use Snowflake's services. Accordingly, the Data Breach was the product of a joint failure by Snowflake and

---

[19] Shane Snider, *Snowflake's Lack of MFA Control Leaves Companies Vulnerable, Experts Say*, InformationWeek (June 5, 2024), https://www.informationweek.com/cyber-resilience/snowflake-s-lack-of-mfa-control-leaves-companies-vulnerable-experts-say (last visited Dec. 10, 2024).
[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] Lily Hay Newman, *The Sweeping Danger of the AT&T Phone Records Breach*, WIRED (July 12, 2024), https://www.wired.com/story/att-phone-records-breach-110-million/ (last visited Dec. 10, 2024).

CLASS ACTION COMPLAINT

Hot Topic to implement the most basic cybersecurity feature: enabling and/or enforcing the use of MFA.

74. Snowflake, as a major data cloud service provider, is aware that basic security measures, such as implementing MFA requirements that include enforcing MFA on all accounts, are critical to protecting sensitive information. Indeed, in July 2024, Snowflake signed the U.S. Cybersecurity and Infrastructure Security Agency's ("CISA") "Secure By Design" pledge, which explains that "[o]ut-of-the-box, products should be secure with additional security features such as multi-factor authentication (MFA)."[24] In a related press release, Snowflake wrote: "*MFA is one of the most important security measures that every business needs to utilize*, and when paired with network policies, it delivers comprehensive security."[25]

75. Despite this pledge and recognition of the critical importance of MFA, neither Snowflake nor Hot Topic took any measures to ensure that the PII located on Snowflake's cloud was fully protected by ensuring and enforcing MFA on all user accounts. This failure left Snowflake's customers' databases vulnerable to infiltration by malicious actors, such as Satanic here.

76. This Data Breach could have been entirely avoided had Snowflake and Hot Topic implemented a policy to enable MFA by default, or by enforcing the use of MFA from the top-down design of Snowflake or within Hot Topic's database for instance.

---

[24] *Secure by Design*, CISA, https://www.cisa.gov/securebydesign (last visited Dec. 10, 2024); *Snowflake Advances Cybersecurity Excellence by Joining CISA Secure by Design Pledge*, Snowflake: Blog (July 29, 2024), https://www.snowflake.com/en/blog/snowflake-cybersecurity-cisa-secure-by-design/ (last visited Dec. 10, 2024).
[25] *Snowflake Advances Cybersecurity Excellence by Joining CISA Secure by Design Pledge*, Snowflake: Blog (July 29, 2024), https://www.snowflake.com/en/blog/snowflake-cybersecurity-cisa-secure-by-design/ (emphasis added) (last visited Dec. 10, 2024).

CLASS ACTION COMPLAINT

***Defendants Knew, Or Should Have Known, of the Risk Because Large
Companies In Possession Of Millions of Consumers' PII Are Particularly
Susceptible To Cyber Attacks***

77.    Prior to the Data Breach, data belonging to Snowflake's corporate clients had already been published on known cybercrime forums and had been advertised as "for sale."[26] Thus, Defendants' data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches specifically targeting Snowflake and retail companies that collect and store PII, preceding the date of the Data Breach.

78.    Snowflake's multiple data breaches in 2024 were preceded by, in 2023, an all-time high for data breaches, with 3,205 breaches affecting 353,027,892 total victims. The estimated number of organizations impacted by data breaches has increased by +2,600 percentage points since 2018, and the estimated number of victims has increased by +1400 percentage points. The 2023 breaches represent a 78-percentage point increase over the previous year and a 72-percentage point hike from the previous all-time high number of breaches (1,860) set in 2021.

79.    In light of recent high profile data breaches at Snowflake and other industry leading companies, including T-Mobile, USA (37 million records, February-March 2023), 23andMe, Inc. (20 million records, October 2023), Wilton Reassurance Company (1.4 million records, June 2023), NCB Management Services, Inc. (1 million records, February 2023), Defendants knew or should have known that the PII that it collected and maintained would be targeted by cybercriminals.

80.    Indeed, cyber-attacks, such as the one experienced by Defendants, have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and

---

[26] *Id.*

prepared for, a potential attack. As one report explained, smaller entities that store PII are "attractive to ransomware criminals…because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[27]

81.    Additionally, as companies became more dependent on computer systems to run their business,[28] *e.g.*, working remotely as a result of the Covid-19 pandemic, and the Internet of Things ("IoT"), the danger posed by cybercriminals is magnified, thereby highlighting the need for adequate administrative, physical, and technical safeguards.[29]

82.    Defendants knew and understood unprotected or exposed PII is valuable and highly sought after by nefarious third parties seeking to illegally monetize that PII through unauthorized access.

83.    At all relevant times, Defendants knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class Members and of the foreseeable consequences that would occur if Defendants' data security systems were breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

84.    Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

---

[27] https://www.law360.com/consumerprotection/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware?nl_pk=3ed44a08-fcc2-4b6c-89f0-aa0155a8bb51&utm_source=newsletter&utm_medium=email&utm_campaign=consumerprotection (last visited Dec. 10, 2024).

[28] https://www.federalreserve.gov/econres/notes/feds-notes/implications-of-cyber-risk-for-financial-stability-20220512.html (last visited Dec. 10, 2024).

[29] https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-and-banking-firms-in-2022 (last visited Dec. 10, 2024).

CLASS ACTION COMPLAINT

85.     The injuries to Plaintiff and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the PII of Plaintiff and Class Members.

86.     The ramifications of Defendants' failure to keep secure the PII of Plaintiff and Class Members are long lasting and severe. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.

87.     Defendants, as a retail company and cloud-based storage warehouse in custody of the PII of their customers, knew, or should have known, the importance of safeguarding PII entrusted to it by Plaintiff and Class Members, and of the foreseeable consequences if its data security systems were breached. This includes the significant costs imposed on Plaintiff and Class Members as a result of a breach. Defendants failed, however, to take adequate cybersecurity measures to prevent the Data Breach.

### Value Of Personally Identifying Information

88.     The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[30] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[31]

---

[30] 17 C.F.R. § 248.201 (2013).
[31] *Id.*

89.     The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[32]

90.     Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information at the point-of-sale in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—dates of birth and names.

91.     Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

92.     The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[33]

---

[32] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited Dec. 10, 2024).
[33] *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at:* https://www.gao.gov/assets/gao-07-737.pdf (last visited Dec. 10, 2024).

CLASS ACTION COMPLAINT

93.    Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

### *Defendants Failed To Comply With FTC Guidelines*

94.    The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

95.    For example, in 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. These guidelines advise businesses, *inter alia*, to protect the personal consumer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[34]

96.    The guidelines further advise businesses: not to maintain PII longer than necessary for authorization of a transaction; to limit access to sensitive data; to use an intrusion detection system to expose a breach as soon as it occurs; to monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and to verify that third-party service providers have implemented reasonable security measures.[35]

97.    To underscore the binding significance and legal ramifications of the promulgated guidance, the FTC has brought enforcement actions against businesses

---

[34] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016). Available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Dec. 10, 2024).
[35] *Id.*

for failing to adequately and reasonably protect consumer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

98.    These FTC enforcement actions include actions against companies, like Defendants.

99.    Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to use reasonable measures to protect PII. The FTC publications and orders described above also form part of the basis of Defendants' duties in this regard.

100.    Defendants failed to properly implement basic data security practices.

101.    Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to the PII of their customers or to comply with applicable industry standards constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

102.    Upon information and belief, Defendants were at all times fully aware of their obligations to protect the PII of its customers, Defendants were also aware of the significant repercussions that would result from their failure to do so. Accordingly, Defendants' conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

CLASS ACTION COMPLAINT

***Defendants Failed To Comply With Industry Standards***

103.    As noted above, experts studying cyber security routinely identify retail companies in possession of PII as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

104.    In light of the evident threat of cyberattacks seeking consumers' PII, several best practices have been identified by regulatory agencies and experts that, at a minimum, should be implemented by companies, like Defendants, in possession of millions of consumers' PII, including but not limited to: educating and training all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data and limiting which employees can access sensitive data; monitoring and limiting network ports; and protecting web browsers and email management systems. Defendants failed to follow these industry best practices, including a failure to implement multi-factor authentication.

105.    Defendants failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

106.    These foregoing frameworks are existing and applicable industry standards for large companies, and upon information and belief, Defendants failed to comply with these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

CLASS ACTION COMPLAINT

***Common Injuries & Damages***

107.    As a result of Defendants' ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of PII ending up in the possession of criminals, the risk of identity theft to Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages, including: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) nominal damages; and (viii) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII.

***Data Breaches Increase Victims' Risk Of Identity Theft***

108.    The unencrypted PII of Class Members will end up for sale on the dark web as that is the *modus operandi* of hackers.

109.    Unencrypted PII may also fall into the hands of companies that will use the detailed PII for targeted marketing without the approval of Plaintiff and Class Members. Simply put, unauthorized individuals can easily access the PII of Plaintiff and Class Members.

110.    The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal PII to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

111.    Plaintiff's and Class Members' PII is of great value to hackers and cyber criminals, and the data stolen in the Data Breach has been used and will continue to be used in a variety of sordid ways for criminals to exploit Plaintiff and Class Members and to profit off their misfortune.

112.    One such example of criminals piecing together bits and pieces of compromised PII for profit is the development of "Fullz" packages.[36]

113.    With "Fullz" packages, cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals.

114.    The development of "Fullz" packages means here that the stolen PII from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII that was exfiltrated in the Data Breach, criminals may still easily create a comprehensive Fullz package

---

[36] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-](https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-finn/ (last visited Dec. 10, 2024).

CLASS ACTION COMPLAINT

and sell it—and then resell it in perpetuity—at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

### *Loss Of Time To Mitigate Risk Of Identity Theft & Fraud*

115.    Cyberattacks and data breaches like the Data Breach are especially problematic because they can negatively impact the overall daily lives of individuals affected by the attack.

116.    The United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft face "substantial costs and time to repair the damage to their good name and credit record."[37]

117.    As a result of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their PII was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet the resource and asset of time has been lost.

118.    Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as researching and verifying the legitimacy of the Data Breach, in part because Defendants have yet to even provide Plaintiff and Class Members notice of the Data Breach. Accordingly, the Data Breach has caused Plaintiff and Class Members to suffer actual injury in the form of lost time—which cannot be recaptured—spent on mitigation activities.

---

[37] *See* U.S. Gov. Accounting Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), *available at* https://www.gao.gov/new.items/d07737.pdf (last visited Dec. 10, 2024).

119.   Plaintiff's mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[38]

120.   Plaintiff's mitigation efforts are also consistent with the steps the FTC recommends that data breach victims take to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[39]

121.   And for those Class Members who experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[4]

### *Diminution of Value of PII*

122.   PII is a valuable property right.[40] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that PII has considerable market value.

---

[38] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf (last visited Dec. 10, 2024).
[39] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps (last visited Dec. 10, 2024).
[40] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf ("GAO Report") (last visited Dec. 10, 2024).

123.    Sensitive PII can sell for as much as $363 per record according to the Infosec Institute.[41]

124.    An active and robust legitimate marketplace for PII also exists. In 2019, the data brokering industry was worth roughly $200 billion.[42]

125.    In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[43,44]

126.    Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[45]

127.    As a result of the Data Breach, Plaintiff's and Class Members' PII, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the PII is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

128.    At all relevant times, Defendants knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class Members, and of the foreseeable consequences that would occur if Defendants' data security

---

[41] *See, e.g.*, John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).
[42] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited Dec. 10, 2024).
[43] https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last visited Dec. 10, 2024).
[44] https://datacoup.com/ (last visited Dec. 10, 2024).
[45] https://digi.me/what-is-digime/ (last visited Dec. 10, 2024).

CLASS ACTION COMPLAINT

systems were breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

129.    The fraudulent activity resulting from the Data Breach may not come to light for years.

130.    Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

131.    Defendants were, or should have been, fully aware of the unique type and the significant volume of data on Defendants' network, amounting to, upon information and belief, hundreds of millions of individuals' detailed personal information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

132.    The injuries to Plaintiff and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the PII of Plaintiff and Class Members.

### *Future Cost of Credit and Identity Theft Monitoring is Reasonable and Necessary*

133.    Given the type of targeted attack in this case, sophisticated criminal activity, and the type of PII involved, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the PII for identity theft crimes –*e.g*., opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

134.    Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her PII was

used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

135.   Consequently, Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future.

136.   The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is reasonable and necessary cost to monitor to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach.

***Loss Of Benefit Of The Bargain***

137.   Furthermore, Defendants' poor data security practices deprived Plaintiff and Class Members of the benefit of their bargain. When agreeing to pay Defendants and/or their agents for retail products or services, Plaintiff and other reasonable consumers understood and expected that they were, in part, paying for the product and/or service and necessary data security to protect the PII, when in fact, Defendants did not provide the expected data security. Accordingly, Plaintiff and Class Members received products or services that were of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendants.

***Plaintiff Alanna Roberson's Experience***

138.   Plaintiff Alanna Roberson is a customer who has purchased products from Hot Topic in recent years.

139.   As a condition of purchasing products at Defendant Hot Topic, Plaintiff provided her PII to Defendant Hot Topic, including her name, contact information, address, date of birth, and other sensitive information.

140.   Upon information and belief, at the time of the Data Breach, Defendant Snowflake maintained Plaintiff's PII in its systems.

CLASS ACTION COMPLAINT

141.    Plaintiff Roberson is very careful about sharing her sensitive PII.
Plaintiff Roberson stores any documents containing her PII in a safe and secure
location. She has never knowingly transmitted unencrypted sensitive PII over the
internet or any other unsecured source. Plaintiff would not have entrusted her PII to
Defendants had she known of Defendants' lax data security policies.

142.    Upon information and belief, Plaintiff's PII was targeted, accessed, and
acquired in the Data Breach.

143.    As a result of the Data Breach, Plaintiff Roberson made reasonable
efforts to mitigate the impact of the Data Breach, including researching and verifying
the legitimacy of the Data Breach. Plaintiff has spent significant time dealing with
the Data Breach—valuable time Plaintiff otherwise would have spent on other
activities, including but not limited to work and/or recreation. This time has been
lost forever and cannot be recaptured.

144.    On or about October 23, 2024, upon learning of the Data Breach,
Plaintiff visited the website www.databreach.com. There, Plaintiff learned that her
information, including potentially Plaintiff's email address, credit card information,
name, phone number, birthday, home address, and job title were compromised in the
Data Breach.

145.    Plaintiff suffered actual injury from having her PII compromised as a
result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii)
theft of her PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity
costs associated with attempting to mitigate the actual consequences of the Data
Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with
attempting to mitigate the actual consequences of the Data Breach; (vii) nominal
damages; and (viii) the continued and certainly increased risk to his PII, which: (a)
remains unencrypted and available for unauthorized third parties to access and
abuse; and (b) remains backed up in Defendants' possession and is subject to further

unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII.

146.    Plaintiff additionally suffered actual injury in the form of experiencing an increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach. This misuse of her PII was caused, upon information and belief, by the fact that cybercriminals can easily use the information compromised in the Data Breach to find more information about an individual, such as their phone number or email address, from publicly available sources, including websites that aggregate and associate personal information with the owner of such information. Criminals often target data breach victims with spam emails, calls, and texts to gain access to their devices with phishing attacks or elicit further personal information for use in committing identity theft or fraud.

147.    The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have still not informed Plaintiff of key details about the Data Breach's occurrence.

148.    As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

149.    As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

150.    Plaintiff Roberson has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

## **CLASS ALLEGATIONS**

151.    Plaintiff brings this nationwide class action on behalf of herself and on behalf of all others similarly situated, pursuant to Fed. R. Civ. P. 23(a), 23(b)(1), 23(b)(2), 23(b)(3), 23(c)(4) and/or 23(c)(5).

152.   The Class that Plaintiff seeks to represent is defined as follows:

**Nationwide Class**

All individuals residing in the United States whose PII was accessed and/or acquired by an unauthorized party as a result of the Data Breach that occurred at Defendants in or about October 2024 (the "Class").

153.   Excluded from the Class are the following individuals and/or entities: Defendants and Defendants' parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendants have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

154.   Plaintiff reserves the right to amend the definitions of the Class or add a Class or Subclass if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

155.   <u>Numerosity</u>: The members of the Class are so numerous that joinder of all members is impracticable, if not completely impossible. Although the precise number of individuals is currently unknown to Plaintiff and exclusively in the possession of Defendants, upon information and belief, hundreds of millions of individuals were impacted. The Class is apparently identifiable within Defendants' records.

156.   Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class that predominate over questions which may affect individual Class members, including the following:

a.   Whether and to what extent Defendants had a duty to protect the PII of Plaintiff and Class Members;

b. Whether Defendants had respective duties not to disclose the PII of Plaintiff and Class Members to unauthorized third parties;

c. Whether Defendants had respective duties not to use the PII of Plaintiff and Class Members for non-business purposes;

d. Whether Defendants failed to adequately safeguard the PII of Plaintiff and Class Members;

e. Whether and when Defendants actually learned of the Data Breach;

f. Whether Defendants adequately, promptly, and accurately informed Plaintiff and Class Members that their PII had been compromised;

g. Whether Defendants violated the law by failing to promptly notify Plaintiff and Class Members that their PII had been compromised;

h. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

i. Whether Defendants adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

j. Whether Plaintiff and Class Members are entitled to actual damages and/or nominal damages as a result of Defendants' wrongful conduct;

k. Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

157. <u>Typicality:</u> Plaintiff's claims are typical of those of the other members of the Class because Plaintiff, like every other Class Member, was exposed to virtually identical conduct and now suffers from the same violations of the law as each other member of the Class.

158. <u>Policies Generally Applicable to the Class</u>: This class action is also appropriate for certification because Defendants acted or refused to act on grounds

generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendants' policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenges of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

159.  <u>Adequacy:</u> Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that he has no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiff seeks no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages he has suffered are typical of other Class Members. Plaintiff has retained counsel experienced in complex class action and data breach litigation, and Plaintiff intend to prosecute this action vigorously.

160.  <u>Superiority and Manageability:</u> The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendants. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

161.  The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the

wrongs alleged because Defendants would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

162.    The litigation of the claims brought herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

163.    Adequate notice can be given to Class Members directly using information maintained in Defendants' records.

164.    Unless a Classwide injunction is issued, Defendants may continue in its failure to properly secure the PII of Class Members, Defendants may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendants may continue to act unlawfully as set forth in this Complaint.

165.    Further, Defendants have acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a classwide basis.

166.    Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

CLASS ACTION COMPLAINT

a.  Whether Defendants failed to timely notify Plaintiff and the Class of the Data Breach;

b.  Whether Defendants owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their PII;

c.  Whether Defendants' security measures to protect their data systems were reasonable in light of best practices recommended by data security experts;

d.  Whether Defendants' failure to institute adequate protective security measures amounted to negligence;

e.  Whether Defendants failed to take commercially reasonable steps to safeguard consumer PII; and

f.  Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

## CAUSES OF ACTION

## COUNT I

### Negligence

### (On Behalf of Plaintiff and the Class)

167.  Plaintiff re-alleges and incorporates by reference all preceding factual allegations, as if fully set forth herein.

168.  Defendants acquired and maintained the PII of Plaintiff and the Class that they received either directly, or which Snowflake received indirectly via Hot Topic.

169.  Defendant Hot Topic acquires its customers, including Plaintiff and Class Members, non-public PII in the ordinary course of providing its retail products and services. Defendant Hot Topic collected the PII of Plaintiff and Class Members

as part of its business of soliciting its services to its customers, which solicitations and services affect commerce.

170.   Defendant Snowflake gathered and stored the PII collected by Defendant Hot Topic of Plaintiff and Class Members in the ordinary course of its cloud-based storage business for its customers, which solicitations and services affect commerce.

171.   Plaintiff and Class Members entrusted Defendants with their PII with the understanding that Defendants would safeguard their information.

172.   Defendants had full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and Class Members could and would suffer if the PII were wrongfully disclosed.

173.   By voluntarily undertaking and assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendants had a duty of care to use reasonable means to secure and safeguard their computer property—and Class Members' PII held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendants' duties included a responsibility to implement processes by which they could detect a breach of their security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

174.   Defendants had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

175.   Defendants owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements

CLASS ACTION COMPLAINT

discussed herein, and to ensure that their systems and networks adequately protected
the PII.

176.   Defendants' duty of care to use reasonable security measures arose as
a result of the special relationship that existed between Defendants and Plaintiff and
Class Members. That special relationship arose because Plaintiff and the Class
entrusted Defendants with their confidential PII, a necessary part of being customers
at Hot Topic and because Defendants were in a superior position to ensure that their
systems were sufficient to protect against the foreseeable risk of harm to Plaintiff
and Class Members from a data breach.

177.   Defendants' duty to use reasonable care in protecting confidential data
arose not only as a result of the statutes and regulations described above, but also
because Defendants are bound by industry standards to protect confidential PII.

178.   Defendants were subject to an "independent duty," untethered to any
contract between Defendants and Plaintiff or the Class.

179.   Defendants also had a duty to exercise appropriate clearinghouse
practices to remove former customers' PII they were no longer required to retain
pursuant to regulations.

180.   Moreover, Defendants had a duty to promptly and adequately notify
Plaintiff and the Class of the Data Breach.

181.   Defendants had and continue to have a duty to adequately disclose that
the PII of Plaintiff and the Class within Defendants' possession might have been
compromised, how it was compromised, and precisely the types of data that were
compromised and when. Such notice was necessary to allow Plaintiff and the Class
to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use
of their PII by third parties.

182.   Defendants breached their duties, pursuant to the FTC Act and other
applicable standards, and thus were negligent, by failing to use reasonable measures

to protect Class Members' PII. The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

    a.  Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII;

    b.  Failing to adequately monitor the security of their networks and systems;

    c.  Allowing unauthorized access to Class Members' PII;

    d.  Failing to detect in a timely manner that Class Members' PII had been compromised;

    e.  Failing to remove former customers' PII they were no longer required to retain pursuant to regulations; and

    f.  Failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

183.    Defendants violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards, as described in detail herein. Defendants' conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

184.    Plaintiff and Class Members were within the class of persons the Federal Trade Commission Act was intended to protect and the type of harm that resulted from the Data Breach was the type of harm that the statute was intended to guard against.

185.    Defendants' violation of Section 5 of the FTC Act constitutes negligence.

186. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

187. A breach of security, unauthorized access, and resulting injury to Plaintiff and the Class was reasonably foreseeable, particularly in light of Defendants' inadequate security practices.

188. It was foreseeable that Defendants' failure to use reasonable measures to protect Class Members' PII would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the retail industry.

189. Defendants have full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and the Class could and would suffer if their PII were wrongfully disclosed.

190. Plaintiff and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Defendants knew or should have known of the inherent risks in collecting and storing the PII of Plaintiff and the Class, the critical importance of providing adequate security of that PII, and the necessity for encrypting PII stored on Defendants' systems or transmitted through third party systems.

191. It was therefore foreseeable that the failure to adequately safeguard Class Members' PII would result in one or more types of injuries to Class Members.

192. Plaintiff and the Class had no ability to protect their PII that was in, and possibly remains in, Defendants' possession.

193. Defendants were in a position to protect against the harm suffered by Plaintiff and the Class as a result of the Data Breach.

194.   Neither Plaintiff nor Class Members contributed to the Data Breach and subsequent misuse of their PII as described in this Complaint.

195.   Defendants' duty extended to protecting Plaintiff and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

196.   But for Defendants' wrongful and negligent breach of duties owed to Plaintiff and the Class, the PII of Plaintiff and the Class would not have been compromised.

197.   There is a close causal connection between Defendants' failure to implement security measures to protect the PII of Plaintiff and the Class and the harm, or risk of imminent harm, suffered by Plaintiff and the Class. The PII of Plaintiff and the Class was lost and accessed as the proximate result of Defendants' failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

198.   As a direct and proximate result of Defendants' negligence, Plaintiff and the Class have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) experiencing an increase in spam calls, texts, and/or emails; (viii) statutory damages; (ix) nominal damages; and (x) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for

CLASS ACTION COMPLAINT

unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect their PII.

199.   Additionally, as a direct and proximate result of Defendants' negligence, Plaintiff and the Class have suffered and will suffer the continued risks of exposure of their PII, which remain in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect their PII in their continued possession.

200.   Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

201.   Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

## COUNT II

### Breach Of Implied Contract

### (On Behalf of Plaintiff and the Class)

202.   Plaintiff re-alleges and incorporates by reference all preceding factual allegations, as if fully set forth herein.

203.   Defendants acquired and maintained the PII of Plaintiff and the Class that they received either directly, or which Snowflake received indirectly via Hot Topic.

204.   Plaintiff and Class Members delivered their PII to Defendant Hot Topic as part of the process of obtaining retail products or services provided by Defendant Hot Topic. Plaintiff and Class Members paid money to Defendant Hot Topic in exchange for products or services and would not have paid for Defendant Hot

1  Topic's products, or would have paid less for them, had they known that Defendant

2  Hot Topic's data security practices were substandard.

3      205.   Defendant Hot Topic solicited, offered, and invited Class Members to

4  provide their PII as part of Defendant Hot Topic's regular business practices.

5  Plaintiff and Class Members accepted Defendant Hot Topic's offers and provided

6  their PII to Defendant Hot Topic.

7      206.   Defendant Snowflake gathered and stored the PII collected by

8  Defendant Hot Topic of Plaintiff and Class Members in the ordinary course of its

9  cloud-based storage business for its customers.

10     207.   Plaintiff and Class Members entrusted Defendants with their PII with

11  the understanding that Defendants would safeguard their information.

12     208.   Defendants accepted possession of Plaintiff's and Class Members' PII

13  for the purpose of providing services to Plaintiff and Class Members.

14     209.   When Plaintiff and Class Members provided their PII to Hot Topic for

15  the purpose of purchasing goods or participating in Hot Topic's loyalty program,

16  they entered into implied contracts with Hot Topic and its affiliates, such as

17  Snowflake.

18     210.   Plaintiff and the Class Members, thus, entered into implied contracts

19  with Defendants by which Defendants agreed to safeguard and protect their PII, to

20  keep such information secure and confidential, and to timely and accurately notify

21  Plaintiff and the Class if their data had been breached and compromised or stolen.

22     211.   In entering into such implied contracts, Plaintiff and Class Members

23  reasonably believed and expected that Defendants' data security practices complied

24  with relevant laws and regulations (including FTC guidelines on data security) and

25  were consistent with industry standards.

26     212.   Implicit in the agreement between Plaintiff and Class Members and the

27  Defendants to provide PII, was the Defendants' obligation to: (a) use such PII for

28

CLASS ACTION COMPLAINT

business purposes only, (b) take reasonable steps to safeguard that PII, (c) prevent unauthorized disclosures of the PII, (d) provide Plaintiff and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their PII, (e) reasonably safeguard and protect the PII of Plaintiff and Class Members from unauthorized disclosure or uses, (f) retain the PII only under conditions that kept such information secure and confidential.

213.   The mutual understanding and intent of Plaintiff and Class Members on the one hand, and Defendants, on the other, is demonstrated by their conduct and course of dealing.

214.   On information and belief, at all relevant times Defendants promulgated, adopted, and implemented written privacy policies whereby they expressly promised Plaintiff and Class Members that they would only disclose PII under certain circumstances, none of which relate to the Data Breach.

215.   On information and belief, Defendants further promised to comply with industry standards and to make sure that Plaintiff's and Class Members' PII would remain protected.

216.   Plaintiff and Class Members paid money to Defendant Hot Topic with the reasonable belief and expectation that Defendant Hot Topic would use part of their earnings to obtain adequate data security. Defendant Hot Topic failed to do so.

217.   Plaintiff and Class Members would not have entrusted their PII to Defendants or purchased Defendant Hot Topic's products in the absence of the implied contract between them and Defendants to keep their information reasonably secure.

218.   Plaintiff and Class Members would not have entrusted their PII to Defendants in the absence of their implied promise to monitor their computer systems and networks to ensure that they adopted reasonable data security measures.

CLASS ACTION COMPLAINT

219.    Every contract in this State has an implied covenant of good faith and fair dealing, which is an independent duty and may be breached even when there is no breach of a contract's actual and/or express terms.

220.    Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with Defendants.

221.    Defendants breached the implied contracts made with Plaintiff and the Class by failing to safeguard and protect their personal information, by failing to delete the information of Plaintiff and the Class once the relationship ended, and by failing to provide accurate notice to them that personal information was compromised as a result of the Data Breach.

222.    Defendants breached the implied covenant of good faith and fair dealing by failing to maintain adequate computer systems and data security practices to safeguard PII, failing to timely and accurately disclose the Data Breach to Plaintiff and Class Members and continued acceptance of PII and storage of other personal information after Defendants knew, or should have known, of the security vulnerabilities of the systems that were exploited in the Data Breach.

223.    As a direct and proximate result of Defendants' breach of the implied contracts, Plaintiff and Class Members sustained damages, including, but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) experiencing an increase in spam calls, texts, and/or emails; (viii) statutory damages; (ix) nominal damages; and (x) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in

Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII.

224. Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

225. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to, *e.g.*, (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

## COUNT III

### Unjust Enrichment

### (On Behalf of Plaintiff and the Class)

226. Plaintiff re-alleges and incorporates by reference all preceding factual allegations, as if fully set forth herein.

227. Plaintiff brings this Count in the alternative to the breach of implied contract count above.

228. Upon information and belief, Defendants fund any data security measures they implement entirely from their general revenues, including from money they make based upon representations of protecting Plaintiff's and Class Members' PII.

229. Thus, there is a direct nexus between money paid to Defendants and the requirement that Defendants keep Plaintiff's and Class Members' PII confidential and protected.

230. Plaintiff and Class Members paid Defendants a certain sum of money, or a certain sum of money was paid on their behalf, which was used to fund any data security measures implemented by Defendants.

CLASS ACTION COMPLAINT

231.   As such, a portion of the payments made by or on behalf of Plaintiff and Class Members is to be used to provide a reasonable and adequate level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendants.

232.   Protecting the PII of Plaintiff and Class Members is integral to Defendants' businesses. Without their data, Defendants would be unable to provide goods and services, including retail services and database cloud services that comprise Defendants' core businesses.

233.   Plaintiff's and Class Members' data and PII has monetary value.

234.   Thus, Plaintiff and Class Members conferred a monetary benefit on Defendants. Specifically, Plaintiffs paid Defendant Hot Topic and/or their agents for retail products or services and in so doing also provided Defendants with their PII. Defendant Hot Topic paid money to a third-party, Defendant Snowflake, to collect and store the PII provided by Plaintiff and Class to Defendant Hot Topic. In exchange, Plaintiff and Class Members should have received from Defendants the products or services that were the subject of the transactions and should have had their PII protected with adequate data security.

235.   Defendants knew that Plaintiff and Class Members conferred a benefit upon them and had accepted and retained that benefit by accepting and retaining the PII entrusted to it. Defendants profited from Plaintiff's retained data and used Plaintiff's and Class Members' PII for business purposes.

236.   Defendants failed to secure Plaintiff's and Class Members' PII and, therefore, did not fully compensate Plaintiff or Class Members for the value that their PII provided.

237.   Defendants acquired the PII through inequitable record retention as it failed to investigate and/or disclose the inadequate data security practices previously alleged.

CLASS ACTION COMPLAINT

238.    If Plaintiff and Class Members had known that Defendants would not use adequate data security practices, procedures, and protocols to adequately monitor, supervise, and secure their PII, they would not have entrusted their PII with Defendants or obtained products or services from Defendants.

239.    Plaintiff and Class Members have no adequate remedy at law.

240.    Defendants enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class Members' PII. Instead of providing a reasonable level of security that would have prevented the hacking incident, Defendants instead calculated to increase their own profit at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures and diverting those funds to their own profit. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' decision to prioritize its own profits over the requisite security and the safety of their PII.

241.    Under the circumstances, it would be unjust for Defendants to be permitted to retain any of the benefits that Plaintiff and Class Members conferred upon them.

242.    As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of their PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) experiencing an increase in spam calls, texts, and/or emails; (viii) statutory damages; (ix) nominal damages; and (x) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in

1  Defendants' possession and is subject to further unauthorized disclosures so long as
2  Defendants fail to undertake appropriate and adequate measures to protect their PII.

3      243.   Plaintiff and Class Members are entitled to full refunds, restitution,
4  and/or damages from Defendants and/or an order proportionally disgorging all
5  profits, benefits, and other compensation obtained by Defendants from their
6  wrongful conduct. This can be accomplished by establishing a constructive trust
7  from which the Plaintiff and Class Members may seek restitution or compensation.

8      244.   Plaintiff and Class Members may not have an adequate remedy at law
9  against Defendants, and accordingly, they plead this claim for unjust enrichment in
10 addition to, or in the alternative to, other claims pleaded herein.

11                          <u>**COUNT IV**</u>
12        **Violation of the California Unfair Competition Law,**
13           **Cal. Bus. & Prof. Code §17200 *et seq.***
14          **(On Behalf of Plaintiff and the Class)**

15     245.   Plaintiff re-alleges and incorporates by reference all preceding factual
16 allegations, as if fully set forth herein.

17     246.   Defendants are "persons" as defined by Cal. Bus. & Prof. Code §
18 17201.

19     247.   Defendants violated Cal. Bus. & Prof. Code § 17200 *et seq*. ("UCL")
20 by engaging in unlawful and unfair business acts and practices.

21     248.   The acts and omissions complained of herein were designed and
22 emanated in this District.

23     249.   Defendants' "unfair" acts and practices include:

24        a. utilizing cheaper, ineffective security measures and diverting those
25            funds to their own profits, instead of providing a reasonable level of
26            security that would have prevented the hacking incident;

27
28

b. failing to follow industry standard and the applicable, required, and appropriate protocols, policies, and procedures regarding the encryption of data;

c. failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages;

d. Omitting, suppressing, and concealing the material fact that they did not reasonably or adequately secure Plaintiff's and Class Members' personal information; and

e. Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class Members' personal information.

250. Defendants have engaged in "unlawful" business practices by violating multiple laws, including the FTC Act, 15 U.S.C. § 45 and California common law.

251. Defendants' unlawful, unfair, and deceptive acts and practices include:

a. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and Class Members' personal information, which was a direct and proximate cause of the Data Breach;

b. Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, which was a direct and proximate cause of the Data Breach;

c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class Members' personal information, including duties imposed by the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach;

CLASS ACTION COMPLAINT

d.  Misrepresenting that they would protect the privacy and confidentiality of Plaintiff's and Class Members' personal information, including by implementing and maintaining reasonable security measures; and

e.  Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class Members' personal information, including duties imposed by the FTC Act, 15 U.S.C. § 45.

252.  Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants' data security and ability to protect the confidentiality of consumers' personal information.

253.  As a direct and proximate result of Defendants' unfair and unlawful acts and practices, Plaintiff and Class Members' were injured and lost money or property, which would not have occurred but for the unfair and deceptive acts, practices, and omissions alleged herein, time and expenses related to monitoring their financial accounts for fraudulent activity, an increased, imminent risk of fraud and identity theft, and loss of value of their personal information.

254.  Defendants' violations were, and are, willful, deceptive, unfair, and unconscionable.

255.  Plaintiff and Class Members would not have purchased products from Defendants, or would have paid less for them, had they known that Defendants failed to employ appropriate measures to secure Plaintiff's and Class Members PII.

256.  Plaintiff and Class Members have lost money and property as a result of Defendants' conduct in violation of the UCL, as stated herein and above.

257.  By deceptively storing, collecting, and disclosing their personal information, Defendants have taken money or property from Plaintiff and Class Members.

258.    Defendants acted intentionally, knowingly, and maliciously to violate California's Unfair Competition Law, and recklessly disregarded Plaintiff's and Class Members' rights.

259.    Plaintiff and Class Members seek all monetary and nonmonetary relief allowed by law, including restitution of all profits stemming from Defendants' unfair and unlawful business practices or use of their personal information; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief, including public injunctive relief.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of herself and Class Members, requests judgment against Defendants and that the Court grants the following:

A.    For an Order certifying the Class, and appointing Plaintiff and her Counsel to represent the Class;

B.    For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the PII of Plaintiff and Class Members;

C.    For injunctive relief requested by Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

    i.    prohibiting Defendants from engaging in the wrongful and unlawful acts described herein;

    ii.    requiring Defendants to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

CLASS ACTION COMPLAINT

iii.   requiring Defendants to delete, destroy, and purge the personal identifying information of Plaintiff and Class Members unless Defendants can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

iv.   requiring Defendants to provide out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII for Plaintiff's and Class Members' respective lifetimes;

v.   requiring Defendants to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII of Plaintiff and Class Members;

vi.   prohibiting Defendants from maintaining the PII of Plaintiff and Class Members on a cloud-based database;

vii.   requiring Defendants to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

viii.   requiring Defendants to engage independent third-party security auditors and internal personnel to run automated security monitoring;

ix.   requiring Defendants to audit, test, and train its security personnel regarding any new or modified procedures;

x.   requiring Defendants to segment data by, among other things, creating firewalls and controls so that if one area of Defendants' network is compromised, hackers cannot gain access to portions of Defendants' systems;

xi.   requiring Defendants to conduct regular database scanning and securing checks;

xii.  requiring Defendants to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class Members;

xiii. requiring Defendants to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiv.  requiring Defendants to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendants' policies, programs, and systems for protecting personal identifying information;

xv.   requiring Defendants to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendants' information networks for threats,

CLASS ACTION COMPLAINT

both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xvi.    requiring Defendants to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect herself;

xvii.    requiring Defendants to implement logging and monitoring programs sufficient to track traffic to and from Defendants' servers; and

xviii.    for a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendants' compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D.    For an award of damages, including actual, nominal, consequential, and punitive damages, as allowed by law in an amount to be determined;

E.    For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.    For prejudgment interest on all amounts awarded; and

G.    Such other and further relief as this Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury on all claims so triable.

CLASS ACTION COMPLAINT

1  Dated: December 13, 2024          Respectfully Submitted,

2                                    By: */s/ Steven M. Nathan*

3                                          STEVEN M. NATHAN

4                                    STEVEN M. NATHAN (Bar No. 153250)

5                                      snathan@hausfeld.com

6                                    **HAUSFELD LLP**

                                     33 Whitehall Street, 14th Floor
7                                    New York, NY 10004
                                     Telephone: (646) 357-1100
8                                    Facsimile: (212) 202-4322

9

10                                   *Counsel for Plaintiff and the Proposed Class*

11                                   *\* Pro Hac Vice Forthcoming*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT